IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LAURA BETH BRUNDY,<br><br>Plaintiff,<br><br>v.<br><br>SCHREIBER FOODS, INC.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:19-CV-00060<br><br>Judge Clark Waddoups |

Before the court is Defendant Schreiber Foods, Inc.'s motion for summary judgment. (ECF No. 20.) The court heard oral argument on Schreiber's motion on March 16, 2022. After considering the parties' briefing and argument, and considering the evidence submitted for and against the motion, and for the reasons set forth herein, the court grants summary judgment on Brundy's first and third causes of action but denies summary judgment on Brundy's second cause of action.

**Factual Background**

This case arises from Brundy's employment, and ultimate termination, by Schreiber. Brundy began working for Schreiber in January 2015 through a temporary employment service and later became a regular employee of the company in March 2015.

Brundy claims that she suffers from generalized anxiety disorder, Post Traumatic Stress Disorder ("PTSD"), depression, social anxiety, and panic attacks arising from abuse and neglect

as a child.[1] Brundy claims that these impairments substantially limit her ability to interact with others and that, when she is close to or required to communicate with male coworkers, she can be reminded of past traumatic experiences, which impairs her ability to perform her job functions.

At some point during her employment by Schreiber, but by at least May 2016, Brundy complained to her supervisor, Travis Keeton, that she was experiencing anxiety as a result of having to work with two co-workers, Heather Hatch and Brad Coleman. (Brundy Dep. at 42:16-44:13; 54:8-56:10; 62:16-63:14, ECF No. 21-2.) Brundy claims that she reported to Keeton that Hatch and Coleman would bully her, and that Hatch, in particular, would yell at and belittle her and caused boxes to hit Brundy in a manner that made her uncomfortable.  (Brundy Dep. at 42:11-43:20.) (*See also* UALD Intake Form at 1-3, ECF No. 21-6.)

During a meeting in May 2016, Brundy requested that Schreiber keep her assigned to Line 10, a particular line at Schreiber's manufacturing facility, as an accommodation for her anxiety. (Brundy Dep. at 63:21-64:1.) Brundy claimed that remaining on Line 10 would assist in dealing with her anxiety as there were fewer employees on that line that she would have to interact with. Schreiber granted Brundy's requested accommodation and kept her assigned to Line 10. (*Id*. at 82:20-84:20.)

In June 2016, Brundy began working with another Schreiber employee named Steve Barret. (*Id*. at 64:2-14.) Brundy claims that Barret would often get in her personal space and inappropriately touch her. (*Id*. at 64:22-66:6.)

---

[1]     Schreiber does not dispute, for purposes of its motion, Brundy's claims that she suffers from such impairments or that Brundy is a disabled person for purposes of the Americans with Disabilities Act (ADA). (Mot. at 8, ECF No. 20.)

In July 2016, Brundy met with Elmer Moto, her supervisor at the time, and raised concerns regarding Barret's behavior. (*Id*. at 67:21-69:14.) Moto said he would speak with Barret about respecting Brundy's personal space but quit his job with Schreiber shortly thereafter. (*Id*. at 69:15-25.) (*See also* UALD Intake Form at 4.) It is unclear from the record whether Moto ever spoke with Barret regarding respecting Brundy's personal space.

In August 2016, Brundy bid for and was awarded a promotion to the position of Blue Shift FLEX Wrapper Operator. (Brundy Dep. at 70:1-22.) Accepting the position would have allowed Brundy to continue working on Line 10, as she desired, but she turned it down. (*Id*. at 71:12-20.) Brundy claims that she turned down the position because Derek Carlson, an employee in Schreiber's human resources department, conveyed the impression to her that she would be fired if she accepted it. (*Id*. at 70:19-73:16.)

Shortly thereafter, Brundy complained to her new supervisor, Joyce Gao, that she was continuing to have problems with Barret. (*Id*. at 38:2-22; 74:15-7516.)  Brundy claims that each time she would report having problems with Barret, his behavior would stop temporarily but then start up again after a while. (*Id*. at 88:22-89:11.) Brundy claims that after she complained about Barret getting in her personal space and allegedly harassing her, Gao told her to "get over" her anxiety. (*Id*. at 87:24-88:5.) (*See also* UALD Intake Form at 6.) Brundy also claims that Joyce told her that if she continued to raise complaints about Barret's conduct she would be written up. (Brundy Dep. at 89:18-90:8.)

In September 2016, Gao implemented a rule barring any contact between Barret and Brundy. (*Id*. at 89:22-90:2.)

Also in September, Brundy bid on and was awarded the position of Purple FLEX Wrapper Operator. (*Id*. at 93:12-94:7.) This time Brundy accepted the promotion. (*Id*. at 94:8-9.) Brundy claims that she accepted the position in order to get away from Barret. (*Id*. at 93:16-19.)

In October 2016, before Brundy began working in her new position as a FLEX Wrapper Operator, Roger Ochsenbein, another Schreiber employee, became Brundy's supervisor. (*Id*. at 97:17-20.) Brundy told Ochsenbein about the problems she had been having with Barret and about the no-contact rule implemented by Gao. (*Id*. at 98:16-99:7.) Brundy also told Oschenbein that if Barret continued to harass her, she would file a sexual harassment suit against the company. (*Id*. at 99:8-11.) In response, Ochsenbein caused Barret to be transferred to a different area of Schreiber's plant. (*Id*. at 99:12-23.)

On October 17, 2016, Brundy was scheduled to begin her shift at Schreiber at 6:00 p.m. (*See id*. at 112:4-10.) When Brundy arrived for her shift, she failed to clock in. (*Id*. at 97:4-6.) Instead, she submitted a Time Addition-Change Request Form, referred to by the parties as a "blue slip," indicating that she began her shift at 5:59 p.m. (*Id*. at 96:2-97:6; 111:17-112:2.) (*See also* Blue Slip, ECF No. 20-6.)   The blue slip was signed by Brundy and approved by Gao, her supervisor, on the same day. (Blue Slip, ECF No. 20-6.)

Brundy claims that she filled out the blue slip because she forgot to clock in when her shift started. (Brundy Deo. At 110:9-11.) She also testified, in her deposition, that the reason she forgot to clock in was because she was running late and was stressed out because she was concerned about the health of her kittens, which Brundy claims were dying. (*Id*. at 112:11-22.)

At some time after Brundy submitted her blue slip, Schreiber discovered from its records that Brundy did not scan her key card to enter the facility where she worked until 6:01 p.m. on

October 17, 2016, two minutes later than the time she claimed she began her shift on her blue slip. (*See* ECF No. 20-6.)

Based on this discrepancy, Schreiber initiated an investigation to determine whether Brundy had falsified her blue slip. During the investigation, Brundy was interviewed by Gao. (*See* Mot. at Exs. 4 & 7, ECF Nos. 20-5 & 20-8.) In the interview, Brundy acknowledged that she was running late, but denied falsifying her blue slip. (Mot. at Ex. 4.)  She claimed that the time she put down on her blue slip—5:59 p.m.—was the last time that she saw on a clock before her shift started but could not recall what clock she had looked at. (*Id*.) Brundy also claimed, during her interview with Gao, that the clocks at Schreiber's facilities were not consistent with each other and that she understood that a clock on Line 10, where Brundy worked, was at least six minutes behind other clocks in the facility. (*Id*.)

After the interview, Gao signed a "Coaching and Corrective Action Form" indicating that Schreiber had found that Brundy committed a Group III violation of Schreiber's policy by "[p]roviding false or deliberately misleading or incomplete information or falsifying any documents or any other work-related act of dishonesty." (Mot. at Ex. 6, ECF No. 207.) The basis for the violation, according to the form, was that Brundy submitted a blue slip stating that she arrived for her shift at 5:59 p.m. when further investigation revealed that she did not enter Schreiber's facility until 6:01 p.m. The form also indicated that Brundy "did admit that she was late during the investigation." (*Id*.)

As a Group III violation, Schreiber's determination that Brundy falsified her blue slip resulted in an automatic suspension pending discharge and Brundy's employment was terminated by Schreiber on November 15, 2016. (*Id*.; Brundy Dep. at 7:8-10.)

In her deposition, Brundy continued to maintain that she had not intentionally falsified her blue slip and explained that she understood that Schreiber policy required her to arrive seven minutes before her shift started and that when she told Gao in her interview that she was "running late," she was referring to the fact that she arrived less than seven minutes before her shift started. (Brundy Dep. at 111:17-112:10.)

Schreiber claims that it fired six other employees, around the same time it terminated Brundy's employment, for falsifying blue slips, including in instances where there were only small discrepancies between the time represented on the employee's timecard and the time the employee entered Schreiber's facility according to Schreiber's records. (*See* Mot. at Exs. 8-9, ECF Nos. 20-9 & 20-10.)

Shortly after her termination, Brundy filed a charge of discrimination with the Utah Anti-Discrimination & Labor Division ("UALD") claiming that she was terminated because of her gender and disabilities. (*See* Am. Charge of Discrimination, ECF No. 21-3.) On February 6, 2018, the UALD issued a determination and order finding no reasonable cause to believe that Schreiber discriminated or retaliated against Brundy. (*See* Determination & Order, ECF No. 23-2.) Thereafter, Brundy filed the current action on June 21, 2019, asserting claims for failure to accommodate, discriminatory termination, and retaliation. (*See* Compl., ECF No. 2.)

Schreiber now moves for summary judgment on each of Brundy's claims.

## Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

<u>Analysis</u>

Schreiber seeks summary judgment on all three of Brundy's causes of action, each of which assert a violation of the American with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213. First, Schreiber argues that Brundy's reasonable accommodation claim fails because Schreiber granted each of the accommodations Brundy sought. Second, Schreiber argues that Brundy's discrimination claim fails because Brundy has not come forward with sufficient evidence to show that she was subjected to discrimination because of her disability. Finally, Schreiber argues that Brundy's retaliation claim fails because Brundy has not shown that Schreiber's termination of her employment was retaliatory.

**I.      Brundy Has Not Shown a Denial of Reasonable Accommodations.**

In her first cause of action, Brundy claims that Schreiber violated the ADA by failing to take actions to ensure that other Schreiber employees respected Brundy's personal space in a timely and complete manner.

The ADA bars discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees,

employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). It further defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* at § 12112(b)(5).

To make a prima facie case on her failure-to-accommodate claim, Brundy must show "(1) she was disabled; (2) she was otherwise qualified; (3) she requested a plausibly reasonable accommodation; and (4) [Schreiber] refused to accommodate her disability." *Norwood v. United Parcel Serv., Inc.*, 57 F.4th 779, 786 (10th Cir. 2023) (citations omitted). Once that showing is made, the burden shifts to Schreiber to "present evidence either conclusively rebutting one of more elements of plaintiff's prima facie case or establishing an affirmative defense." *Id.* (citation and internal quotation marks omitted).

For purposes of this motion, Schreiber does not dispute that Brundy has generalized anxiety disorder and PTSD and, thus, qualifies as a disabled individual for purposes of the ADA. (*See* Mot. at 8, ECF No. 20.) Nor does Schreiber contest that Brundy is "otherwise qualified" to perform her job functions with or without reasonable accommodation. (*Id.*) Schreiber does, however, contest that Brundy requested a plausibly reasonable accommodation that Schreiber refused to provide.

### A.   Statute of Limitations

As an initial matter, Schreiber argues that the court should not consider any purported requests for accommodation made prior to August 31, 2016. (Mot. at 3, 8, ECF No. 20.) This is

so, according to Schreiber, because Brundy alleged in her complaint that the court may treat events prior to August 3, 2016 as "being untimely for purposes of relief." (*See* Compl. at ¶ 8, ECF No. 2.) Schreiber claims that the August 3, 2016 date identified in Brundy's complaint is a miscalculation of the 180-day period within which a charge of discrimination must be filed with the Equal Employment Opportunity Commission ("EEOC") pursuant to 42 U.S.C. § 2000e-5(e)(1).[2] According to Schreiber, Brundy did not file her charge of discrimination with the EEOC until February 27, 2017, which would bar any claims based on conduct prior to August 31, 2016 if the 180-day statute of limitations set forth in Section 2000e-5(e)(1) were applicable in this case.[3] (Mot. at 3 n.3.)

Brundy argues that the 180-day statute of limitations referenced by Schreiber is not applicable in this case because the EEOC has given the Utah Antidiscrimination & Labor Division ("UALD") authority to investigate and enforce employment discrimination claims on its behalf. Thus, Brundy argues, because she initially instituted her employment discrimination

---

[2]      42 U.S.C. § 121117(1) provides that the procedures for pursuing a claim under Title VII, including the time for bringing a charge of discrimination under Section 2000e-5, apply to claims pursued for violations of the ADA.

[3]      In her complaint, Brundy alleges that her charge of discrimination was filed on February 21, 2017. (Compl. at ¶ 8.) Schreiber contends the document Brundy references in her complaint was a draft charge of discrimination, and that the actual charge was not filed until February 27, 2017 (Mot. at 3 n.3.) Neither party has filed the charge of discrimination, or any other evidence regarding when it was filed, with the court. Thus, it is impossible for the court to verify when the charge was actually filed. In her opposition memorandum, however, Brundy appears to agree that the charge was filed on February 27, 2017. (*See* Opp. Mem. at 4 (calculating 300-day statute of limitations based on February 27, 2017).) Thus, the court will assume that the charge was filed on February 27, 2017.

Moreover, 180 days prior to February 21, 2017 would be August 25, 2016, not August 3, 2016. It is unclear how Brundy determined that August 3, 2016 was the key date for determining what claims were actionable in this case. The court assumes it was simply based on a miscalculation.

proceedings with the UALD, her claims are subject to a 300-day, rather than a 180-day, statute of limitations. *See* 42 U.S.C. § 2000e-5(e)(1) ("[I]n a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . ."). Accordingly, Brundy argues that the court can consider conduct dating back to May 4, 2016. (*See* Opp. Mem. at 3-4, ECF No. 21.)

Schreiber does not contest that Brundy's analysis of the statute of limitations is correct,[4] but it argues, in its reply, that asking the court to consider conduct prior to August 2016 is tantamount to a motion to amend the complaint, which is improperly raised in a memorandum opposing summary judgment. (*See* Reply at 2-6, ECF No. 23.) Schreiber claims that it would be unduly prejudiced if Brundy is permitted to pursue claims relating to conduct before August 2016 as it focused its discovery efforts on events that occurred after August 2016.

Determining the applicable statute of limitations is a question of law that is governed by relevant statutes and case law, not the erroneous legal assertions made in a plaintiff's complaint. Indeed, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, to the extent Brundy made erroneous assertions regarding the applicable statute of limitations in her complaint, those

---

[4] Schreiber suggests that Utah's status as a deferral state "does not automatically entitle Plaintiff to seek recovery for acts dating back 300 days prior to the date she filed her Charge of Discrimination," but provides no basis for concluding that the 300-day limitations period would not be applicable in this case. (*See* Reply at 3, ECF No. 23.)

assertions have no impact on what statute of limitations should properly be applied to her claims in this case.

Here, it is well established that a party filing a charge of discrimination with a state agency that has authority to investigate employment discrimination (a "deferral state") must do so within 300 days of an alleged unlawful employment practice, and that Utah is a deferral state. *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1183 n.1 (10th Cir. 2003) (citing 42 U.S.C § 2000e-5(e)(1)). Because Brundy filed her charge of discrimination with UALD, her claims are subject to a 300-day, rather than a 180-day, statute of limitations.[5] Accordingly, the court may consider Brundy's claims to the extent they are based on alleged adverse employment actions that occurred on or after May 3, 2016.[6]

Schreiber is correct, however, that Brundy cannot introduce new claims into this action, that were not properly pleaded in her complaint, by introducing them for the first time in her opposition to Schreiber's summary judgment motion. Nor is she permitted to seek an amendment of her complaint, tacitly or otherwise, by asserting new claims in her opposition memorandum. *See* DUCivR 7-1(b)(A). Thus, to the extent Brundy seeks to defeat summary judgment by asserting new claims that were not pleaded in the complaint, those new claims will be disregarded by the court.

---

[5]   Schreiber also cites to a statement in the Determination and Order issued by UALD that indicates that it applied a 180-day statute of limitations. (*See* Reply at 3 n.5 (citing UALD Determination and Order at 1, ECF No. 23-2).) It is not clear why UALD concluded that a 180-day limitations period applies in this case, which is contrary to Section 2000e-5 and settled case law. The court is not bound by UALD's erroneous legal conclusions.

[6]   As noted above, the court assumes based on the parties' representations that Brundy's charge of discrimination was filed on February 27, 2017. 300-days prior to February 27, 2017 would be May 3, 2016, not May 4, 2016 as indicated in Brundy's opposition memorandum.

Nevertheless, it is not the case, as Schreiber alleges, that Brundy's complaint is strictly limited to claims based on events allegedly occurring after August 31, 2016. To the contrary, the complaint alleges facts that pre-date August 2016. (*See* Compl. at ¶¶ 15-27.) To the extent those alleged facts support Brundy's causes of action, including her claim that Schreiber failed to provide reasonable accommodations for her disability, they were fairly stated in the complaint and no amendment is necessary. Thus, Schreiber was on fair notice that Brundy would pursue her claims based on those events and cannot claim to be prejudiced.

### B.      Requests for Accommodation

To satisfy the third element of her prima facie case, Brundy must show that she "requested a plausibly reasonable accommodation" for her disability. *Norwood*, 57 F.4th at 786. Indeed, "before an employer's duty to provide reasonable accommodations . . . is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011). The request "does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,'" but it "nonetheless must make clear that the employee wants assistance *for his or her disability*." *Id.* (citation omitted, emphasis in original).

Thus, in order for a request for accommodation to trigger an employer's obligations under the ADA, the request must inform the employer, not only that the employee is disabled, but also that "the request for assistance was made to accommodate a disability." *See Edmonds-Radford v. Sw. Airlines Co.*, 17 F.4th 975, 992-93 (10th Cir. 2021). Therefore, even where an employer is aware, from prior interactions, that an employee is disabled, its accommodation obligations are not triggered where the employee makes no reference to the disability when

requesting an accommodation. *See C.R. England*, 644 F.3d at 1048 (employees request for home time did not trigger obligations under the ADA where "he made no reference to any disability in his request for 'home time' that would put C.R. England on notice that a reasonable accommodation was being requested under the ADA.") (citation and internal quotation marks omitted). "It is not the employer's responsibility to anticipate the employee's needs and affirmative offer accommodation if the employer is otherwise open to such requests." *Id*. at 993.

     In her complaint, Brundy explicitly identifies two requests for accommodation that she purportedly made while employed by Schreiber. First, she alleges that, in May 2016, she "requested a reasonable accommodation in the form of being allowed to remain on line 10, the current line on which she worked." (Compl. at ¶ 20.) Second, she alleges that in July 2016, in a meeting with Elmer Moto, her supervisor at the time, that she "asked for the accommodation of having her coworkers, especially male coworkers, not invade her personal space due to the effect it had on her anxiety and PTSD . . . ." (*Id*. at ¶ 25.)

     In her memorandum opposing summary judgment, however, Brundy characterizes her requested accommodations differently. She claims that Schreiber failed to provide her with reasonable accommodations by (1) not responding to her complaint and requests regarding Heather Hatch and Brad Coleman in a timely manner and (2) not responding to her complaint and requests regarding Steve Barret in a timely manner. (*See* Opp. Mem. at 16.)

     The complaint, however, makes no reference at all to Brad Coleman and does not explicitly allege that Brundy made a request for accommodation regarding the conduct of Heather Hatch.  The complaint does allege, however, that Brundy raised concerns about Hatch's conduct in a meeting with Travis Keeton, Brundy's supervisor, held in May 2016. (Compl. at ¶¶

15-16.) It also alleges that Brundy told Keeton, in the same meeting, that Hatch's treatment of her was triggering her PTSD symptoms. (*Id*. at ¶ 15.)

Because the complaint makes no reference to Coleman, it cannot state a claim for failure to accommodate based on a request relating to the conduct of Coleman.  Thus, to properly pursue an accommodation claim relating to the conduct of Brad Coleman, Brundy would need to amend her complaint. As discussed above, however, Brundy has not brought a proper motion seeking to amend her complaint and the court, therefore, will not consider her argument to the extent it is based on new allegations, raised for the first time in her opposition memorandum, relating to the conduct of Coleman.

Because the complaint does allege facts regarding the conduct of Hatch, however, including that Brundy raised concerns with her supervisor regarding her treatment by Hatch, the court will consider whether Brundy has met her evidentiary burden of showing that she made a request for a reasonable accommodation relating to the conduct of Hatch that triggered Schreiber's obligations under the ADA.

Thus, the court will consider whether Brundy has come forward with sufficient evidence to allow a reasonable jury to conclude that she made the following requests: (1) that Schreiber grant an accommodation relating to the conduct of Hatch, (2) that Schreiber allow Brundy to continue working on Line 10, and (3) that Schreiber take action to prevent her coworkers, especially male coworkers, from invading her personal space.

        i.     <u>Conduct of Heather Hatch</u>

In her complaint, Brundy alleges that she told Travis Keeton, her supervisor, in a May 2016 meeting, that the way Hatch was treating her was triggering her PTSD symptoms. (Compl.

at ¶ 15.) More specifically, Brundy alleges that she told Keeton that Hatch would stack boxes and purposely let them fall on her. (*Id.*)

Brundy provided a more detailed description of her interactions with Hatch in her deposition testimony and in a narrative she provided to the UALD with her intake questionnaire. There, she claimed that Hatch would bully her, scream at and belittle her when equipment would malfunction, and gossip about her with other Schreiber employees. (*See* Brundy Dep. at 41:1-24; UALD narrative at 1.) With respect to the incident regarding boxes, Brundy claimed in the narrative that she submitted to UALD that:

> Heather and Brad would build a pile of boxes first then stack them. It seemed to make the process faster. When Heather built the pile, a lot of boxes would hit me or come close to hitting me. My discomfort was obvious. Heather's boxes wouldn't hit Karla Sandoval, the other boxer. Just me. It got so bad that I wouldn't stack the box pile for Heather, but I would for Brad because the boxes he built wouldn't hit me.

(UALD narrative at 1.) In her deposition, Brundy testified that she received "cuts from cardboard" as a result of Hatch's behavior. (Brundy Dep. at 142:7-18.)

Brundy also testified about her May 2016 meeting with Keeton in her deposition. Brundy explained that she told Keeton about the way Heather was treating her and that her and Keeton discussed issues relating to her anxiety. (*See* Brundy Dep. at 43:21-44:13; 54:8-18; 56:7-10; 62:19-63:14.) Brundy testified that Keeton asked her if she had talked to Hatch about her behavior and refused to discipline Hatch. (*See id.* at 42:16-20; 55:3-16; UALD narrative at 3.)

While the court finds Brundy's description of Hatch's conduct concerning, and understands why she would raise concerns about Hatch's behavior with her supervisor, the court has found no evidence in the record that Brundy ever requested an accommodation for her

disability relating to the behavior of Hatch. To the contrary, when Schreiber's counsel asked Brundy during her deposition whether she requested any accommodations from Keeton during their May 2016 meeting, Brundy responded: "Just that I stay on line 10. I couldn't be moved anywhere else." (*Id*. at 63:21-24.)

Because there is no evidence that Brundy requested an accommodation for her disability from Schreiber regarding the behavior of Hatch, Brundy has failed to satisfy the third element of a prima facie case relating to her claim that Schreiber failed to accommodate her with respect to Hatch's conduct.

ii.    <u>Remain on Line 10</u>

The court next considers Brundy's claim that she requested to remain on line 10. Brundy testified in her deposition that, during her May 2016 meeting with Keeton, she requested that she not be reassigned away from line 10. (Brundy Dep. at 63:21-24.) She explained that she previously tried to box on lines 11 and 12 but had a panic attack. (Brundy Dep. at 82:20-84:20. *See also* UALD narrative at 5.)

The court concludes that Brundy's request to remain on line 10 was a valid request for an accommodation that triggered Schreiber's obligations under the ADA.

There is no genuine dispute, however, that Schreiber granted Brundy's request to stay on line 10. Brundy acknowledged as much in her deposition. (Brundy Dep. at 63:25-64:1 ("Q. And did you stay on line 10? A. Uh-huh (affirmative). I did.).)

Thus, while there is no dispute that Brundy requested an accommodation for her disability in the form of remaining assigned to line 10, there is also no dispute that Schreiber provided that accommodation. Therefore, Brundy's request that she remain assigned to line 10

16

cannot provide a basis for holding Schreiber liable for failing to provide a reasonable accommodation for Brundy's disability.

>            iii.     Preventing Co-Workers from Invading Personal Space

Finally, Brundy testified in her deposition that she met with her supervisor, Elmer Moto, in July 2016 to raise concerns about the conduct of Steve Barret. Brundy testified that she was pulled into Moto's office and told that there had been several complaints made against her by her coworkers. (Brundy Dep. at 67:10-68:5.) She testified that Moto told her that if her behavior continued, she would be written up for teamwork. (*Id*. at 68:6-10.)

In response, Brundy testified that she raised concerns about Barret, telling Moto "about [her] concerns for Steve's incompetence and [her] concerns that [she] was being sexually harassed." (*Id*. at 68:11-69:14.) Brundy, however, chose not to make a formal complaint against Barret at that time. (*Id*.)

In her UALD narrative, Brundy provides more detail about Barret's alleged behavior, claiming she told Moto that Barret would grind against her while she was inspecting the line and would brush against her breast with his elbow or hand. (UALD narrative at 4.) Brundy claims that Moto told her that he would talk to Barret about staying out of Brundy's personal space and would follow up with HR about Steve's training. (*Id*.)

Neither Brundy's deposition nor the narrative she submitted to UALD clearly indicates that Brundy made a request that Schreiber take action to prevent all other co-workers from invading her personal space. But even assuming that such a request was made, the court has found no evidence in the record that Brundy informed Schreiber that she needed an accommodation relating to co-workers invading her personal space *because of her disability*.

Instead, by her own testimony, Brundy told Moto that her complaints about Barret's behavior arose from concerns about his incompetence and purported sexual harassment.

While Schreiber may have had some legal obligation to take action upon learning about Brundy's claim that she was sexually harassed by Barret, those obligations did not arise under the ADA where Brundy failed to connect her request for accommodation to her disability. As discussed above, in order to trigger Schreiber's obligations under the ADA, Brundy has to show that she informed Schreiber of her disability and that she needed an accommodation because of her disability.[7] Brundy has failed to make such a showing with respect to her claim that Schreiber failed to provide her accommodations relating to the conduct of Barret.

Because Brundy has not presented evidence sufficient to establish a prima facie case that Schreiber failed to provide reasonable accommodation with respect to any of the accommodation requests identified in the complaint, the court must grant summary judgment in Schreiber's favor on Brundy's failure to accommodate claim.

## II.   Discriminatory Termination

In her second cause of action, Brundy alleges that Schreiber should be held liable for discrimination under the ADA because the termination of her employment in October 2016 was because of her disabilities.

The parties agree that Brundy does not have any direct evidence that Brundy's termination was because of her disability. Instead, Brundy seeks to prove her claims through

---

[7]     While the complaint does allege that Brundy raised additional complaints about Barret's behavior after her July meeting with Moto, the complaint does not allege that Brundy made any requests for accommodation relating to Barret's behavior after July 2016. Accordingly, the complaint fails to state a claim for failure to accommodate based on communications with Schreiber after July 2016.

circumstantial evidence. Thus, Brundy's discrimination claim must be evaluated under the *McDonnell-Douglas* burden-shifting framework. *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1217 (10th Cir. 2010) ("Where . . . an ADA plaintiff seeks to proceed to trial exclusively on the basis of circumstantial evidence of discrimination, we have held that 'the analytical framework first articulated in' *McDonnell Douglas* in the context of Title VII claims controls our analysis.") (citation omitted).

Under that framework, Brundy must first come forward with evidence to establish a prima facie case of discrimination by showing that (1) she is disabled within the meaning of the ADA, (2) she is qualified for the job she held, and (3) she was discriminated against because of her disability. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018). If Brundy has come forward with sufficient evidence to establish her prima facie case, then the burden shifts to Schreiber to articulate a "legitimate, non-discriminatory reason" for terminating Brundy. *Id.* at 1193. If Schreiber has met that burden, then the burden shifts back to Brundy to show that Schreiber's stated reason for her termination was a "pretext for discrimination." *Id.*

While Brundy's burden of establishing a prima facie case is not onerous, if Schreiber has sufficiently articulated a legitimate, non-discriminatory reason for terminating Brundy's employment, then Brundy bears the ultimate burden of persuasion that her disability was the but-for cause of her termination. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) ("[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."); *Crane v. Utah Dep't of Corrections*, 15 F.4th 1296, 1313 (10th Cir. 2021) ("[T]he ADA . . . requires the plaintiff's disability to be a but-for cause . . . of the discrimination[.]").

Here, Schreiber contends that Brundy has not presented sufficient evidence to make out a prima facie case of discrimination and cannot show that Schreiber's stated reason for terminating Brundy was a pretext for discrimination.

The court will consider each stage of the *McDonnell-Douglas* analysis in turn.

### A.      Prima Facie Case

Schreiber does not contest that Brundy is disabled or qualified for the position she held prior to her termination. Instead, it challenges only Brundy's ability to show that her termination was the result of discrimination because of her disability.

In order to satisfy the third element of her prima facie case, Brundy must present "some affirmative evidence that disability was a *determining factor* in [Schreiber's] employment decision." *Lincoln*, 900 F.3d at 1193 (emphasis in *Lincoln*). The plaintiff's burden to produce evidence giving rise to an inference of discrimination, however, "is not onerous." *Id*.  Courts have recognized that a variety of circumstances may give rise to an inference of discrimination, including (1) "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," (2) "preferential treatment given to employees outside the protected class," (3) "the systematic transfer of a discharged employee's duties to other employees," (4) "a pattern of recommending the plaintiff for positions for which she is not qualified [or is overqualified for]", and (5) "failure to surface plaintiff's name for positions for which she is well-qualified." *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (citation omitted).

Brundy argues that she has come forward with sufficient evidence to support a prima facie case of discrimination. First, she points to her testimony that after telling her supervisor, Joyce Gao, that Barret's behavior towards her was causing her anxiety, Gao responded by telling

her to "get over it." *See* Brundy Dep. at 87:24-88:5. Then, after she was aware that Brundy was dealing with PTSD and anxiety, Gao threatened to discipline Brundy if she raised any further complaints about Barret's behavior. *See* Brundy Dep. at 88:22-90:20.

Brundy also points to comments made by Derek Carlson. According to Brundy's deposition testimony, after Brundy was offered her initial promotion to the position of Blue Shift FLEX Wrapper Operator, and around the time that she met with Carlson and others to raise concerns about the effect Barret's conduct was having on her anxiety and PTSD, Carlson made comments to Brundy that strongly implied that she would be fired if she accepted the promotion.

Finally, Brundy points to what she claims was an inadequate investigation prior to her termination as further evidence of Schreiber's discriminatory intent.[8]

While any one of these facts in isolation may not be sufficient to demonstrate that Schreiber had discriminatory intent when it chose to terminate Brundy's employment, the court concludes that when considered together, they are sufficient to allow a reasonable jury to find that Brundy has made a prima facie case of employment discrimination. Accordingly, a genuine issue of material fact exists regarding whether Brundy was terminated because of her disability.

In coming to this conclusion, the court relies, in part, on the Tenth Circuit's decision in *Den Hartog v. Wasatch Academy*, 129 F.3d 1076 (10th Cir. 1997). In *Den Hartog*, the Tenth Circuit made clear that the ADA requires employers to "tolerate eccentric or unusual conduct caused by the employee's mental disability, so long as the employee can satisfactorily perform the essential functions of his job." *Id*. at 1088. Thus, "an employer may *not* hold a disabled

---

[8]     The court will discuss Schreiber's investigation in more detail below when addressing whether Schreiber's explanation for its termination of Brundy was pretextual.

employee to precisely the same standards of conduct as a non-disabled employee unless such standards are job-related and consistent with business necessity." *Id*. at 1086 (emphasis in original).

Applying the ADA to employees with mental disabilities such as anxiety or PTSD is a difficult task. Such disabilities can be difficult to detect and it can be difficult to understand what impact such disabilities may have on the way an employee may interact with other employees. Nevertheless, as the Tenth Circuit recognized in *Den Hartog*, "[m]ental illness is manifested by abnormal behavior, and is in fact normally diagnosed on the basis of abnormal behavior." 129 F.3d at 1087 (citing *Diagnostic and Statistical Manual of Mental Disorders* 350 (4th ed.1994)). Thus, "[t]o permit employers carte blanche to terminate employees with mental disabilities on the basis of any abnormal behavior would largely nullify the ADA's protection of the mentally disabled." *Id*.

Here, while the evidence relied on by Brundy does not necessarily show that Schreiber's decision to terminate Brundy's employment was necessarily the result of some hostility Schreiber held towards individuals with anxiety and PTSD, it does suggest that Schreiber's decision makers may have been motivated by concerns about Brundy's behavior, which may have been caused by Brundy's disabilities. The evidence is, thus, sufficient to permit a jury to consider whether Schreiber's intolerance of Brundy's disability-caused behavior was a deciding factor in Schreiber's decision to terminate Brundy.

**B.     Schreiber's Legitimate Non-Discriminatory Reason for Terminating Brundy**

Schreiber argues that it did not terminate Brundy because of her disability. Instead, it contends that Brundy's termination was based on Schreiber's determination that Brundy was

dishonest on her blue slip about the time she arrived for work on October 17, 2016. Schreiber claims it was its policy to terminate any employee who was found to have been dishonest on a blue slip. As support, it has presented records showing that it has terminated other employees who were found to have misrepresented the time they began their shifts on blue slips. (*See* Mot. at Exs. 8-9, ECF Nos. 20-9 & 20-10.)

Brundy concedes that Schreiber has met its burden of articulating a legitimate, non-discriminatory reason for terminating Brundy's employment. (*See* Opp. at 25, ECF No. 21.)

The court agrees. Regardless of the wisdom of such a policy, Schreiber had the right to terminate employees based on misrepresentations on time sheets—even where the discrepancy between the time listed on a blue slip and the time an employee actually began their shift was small. Schreiber has come forward with evidence sufficient to allow a fact finder to conclude that it has adopted this policy and relied on it when terminating Brundy. Thus, unless Brundy can show that Schreiber's stated reason for terminating her employment was pretextual, Schreiber cannot be held liable for terminating Brundy because of her disability.

### C.     Pretext

Brundy argues that while Schreiber has met its burden of identifying a legitimate, non-discriminatory reason for her termination, that reason was pretextual. Brundy contends that Schreiber's failure to conduct an adequate investigation before reaching the conclusion that Brundy had lied on her blue ship demonstrates the pretextual nature of Schreiber's stated justification for her termination.

When considering whether Schreiber's stated reason for terminating Brundy's employment was pretextual, the court must give some deference to Schreiber's decision making.

The court's role is to prevent discriminatory conduct, "not to act as a super personnel department that second guesses employers' business judgment." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1223 (10th Cir. 2000) (quoting *Simms v. Okla.*, 165 F.3d 1321, 1330 (10th Cir. 1999)). Thus, the court does not consider whether Schreiber's decision was "wise, fair or correct, but whether [it] honestly believed [the legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith on those beliefs." *Johnson*, 594 F.3d at 1211 (alterations in original, citations omitted).

After reviewing the parties' evidence, the court concludes that Brundy has come forward with sufficient evidence to raise a genuine issue of material fact regarding whether Schreiber honestly believed its stated justification for terminating Brundy's employment—that Brundy lied on her blue slip.

To support its contention that it terminated Brundy for being dishonest on her blue slip, Schreiber points to records showing it has terminated the employment of other employees that misrepresented the time they began their shift on blue slips. (*See* Mot. at Exs. 8 & 9, ECF Nos. 20-9 & 20-10.) Brundy does not dispute that Schreiber has terminated other employees for making misrepresentations on their blue slips. She argues, however, that the records submitted by Schreiber do not show that she was similarly situated to those employees.

The court agrees with Brundy. While Schreiber's records show that Schreiber has terminated other employees for falsifying their blue slips, even for minor discrepancies, Schreiber's records show that it only imposes such discipline after finding that the falsification was intentional. Schreiber submitted three disciplinary reports describing the circumstances that led to the termination of employees for falsifying their blue slips. (*See* Mot. at Ex. 9, ECF No.

20-10.) In two of those reports, the employees purportedly admitted that they falsified their blue slip. (*Id*. at 2 & 4.) And the third report shows that the employee would have "went over his attendance percentage and received a corrective action for attendance" if he would have clocked in late, showing that the employee had motivation to intentionally misrepresent the time he arrived for his shift. (*Id*. at 3.)

Thus, Schreiber's evidence that it has terminated other employees based on findings that they intentionally falsified their blue slips is not enough, by itself, to show that Schreiber applied its policy evenly in Brundy's case. Instead, the court must consider whether Schreiber conducted a good faith investigation that supported an honest conclusion that Brundy also intentionally misrepresented the time she began her shift on her blue slip.

In support of its investigation, Schreiber relies on two pieces of evidence. First, it points to its own internal records showing that Brundy scanned her key card to enter Schreiber's facility at 6:01 p.m. on October 17, 2016, while Brundy represented on her blue slip that she began her shift at 5:59 p.m. (*See* Mot. at Ex. 5, ECF No. 20-6.)

While Brundy does not dispute what Schreiber's records show, she testified in her deposition that there is no visible clock on the door lock she scanned to enter Schreiber's building, (Brundy Dep. at 104:13-16), and that various clocks at Schreiber's facility were inconsistent with each other, (*id*. at 102:21-130:1; 178:9-16.)

Based on such evidence, a reasonable jury, crediting Brundy's testimony, could find that Schreiber could not have formed an honest belief, based on records of the time Brundy scanned her key card to enter Schreiber's facility alone, that Brundy intentionally misrepresented the time she began her shift.

Second, Schreiber relies on what appear to be notes summarizing interviews that Joyce Gao conducted with Brundy regarding the incident. These notes indicate that Brundy acknowledged that she forgot to clock in because she was running late, but also that Brundy maintained that she filled her blue slip out in good faith and that she believed that it was necessary to fill out a blue slip any time she arrived less than seven minutes before her shift started. (*See* Mot. at Exs. 4 & 7, ECF No. 20-5 & 20-7.) Nothing in the notes submitted by Schreiber show that Brundy admitted to falsifying her blue slip. (*See generally id*.) In her deposition, Brundy also testified, consistent with the notes submitted by Schreiber, that she believed that she was running late because she arrived less than seven minutes before her shift began. (*See* Brundy Dep. at 111:17-112:10.)

Schreiber has not submitted any other evidence to show how it reached its conclusion that Brundy intentionally falsified her blue slip.

Viewing the evidence in the light most favorable to Brundy, the court concludes that a reasonable jury could conclude that Schreiber did not conduct a good faith investigation that would support an honest belief that Brundy intentionally falsified her blue slip. Nothing in the evidence submitted by Schreiber shows that Brundy admitted to falsifying her blue slip.  And a jury could credit Brundy's testimony that she believed she was "running late" because she arrived less than seven minutes before her shift started, but filled out her blue slip in good faith based on the time she saw on the last clock she looked out before she filled out the form.

Moreover, a reasonable fact finder could consider the fact that the person conducting the investigation into whether Brundy falsified her blue slip, and who signed the corrective action form that led to Brundy's termination—Joyce Gao—was also the person who Brundy has

testified told Brundy to "get over" her anxiety and threatened to discipline Brundy if she raised further complaints about her co-workers' behavior.

When all the evidence is viewed together, a reasonable jury could conclude that Schreiber did not conduct a good faith investigation of Brundy's intent in filling out her blue slip and, therefore, used its blue slip policy as a pretext for terminating Brundy's employment.

Accordingly, there is a genuine issue of fact regarding whether Schreiber's stated reason for terminating Brundy's employment was pretextual. The court must, therefore, deny Schreiber's motion for summary judgment on Brundy's discriminatory termination claim.

## III.    Retaliation

Because Brundy has not presented any direct evidence that Schreiber terminated her for retaliatory reasons, her retaliation claim must also be evaluated under the *McDonnell Douglas* framework. *See Hermann v. Salt Lake City Corp.*, 21 F.4th 666, 679 (10th Cir. 2021). To establish a prima facie case of retaliation, Brundy must show (1) that she engaged in a protected activity, (2) that she suffered a material adverse action, and (3) a causal connection exists between the protected activity and the adverse action. *Id.*

To show that she engaged in a protected activity under the ADA, Brundy must show that she either (1) "opposed any act or practice made unlawful by [the ADA]" or (2) participated in an action for enforcement of the ADA by "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). The Tenth Circuit has also recognized that making a request for a reasonable accommodation as protected activity under the ADA's participation clause. *See Jones v. U.P.S.,*

*Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007) (citing *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1265 (10th Cir. 1999)).

In order for an action to qualify as "protected opposition an employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the [ADA]." *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (citations omitted). "[G]eneralized employment complaints" do not suffice." *Id*. at 1202-03.

Here, Brundy alleges in her complaint that she was retaliated against for engaging in four protected activities: (1) telling Keeton, on May 5, 2016, about her disability and that Hatch's behavior was exacerbating her symptoms; (2) telling Moto, on July 18, 2016, about her disability and that Barret was getting in her personal space; (3) telling Gao, in August 2016, that Barrett was getting in her personal space; and (4) complaining to Oschenbein, in October 2016, about Barrett's behavior. (Compl. at ¶ 73, ECF No. 2.)

The court concludes that none of the events identified in Brundy's complaint qualify as protected activities under the opposition clause of the ADA.

First, the only evidence presented to the court regarding Brundy's meeting with Keeton in May 2016 is Brundy's deposition testimony. In her deposition, Brundy testified that she raised concerns regarding Hatch's behavior towards her during that meeting and that she discussed her anxiety with Keeton. (Brundy Dep. at 42:16-44:13, 54:8-56:14; 62:16-64:1.) Nowhere in her deposition, however, does Brundy testify that she raised any complaints during her meeting with Keeton about Schreiber discriminating against her because of her disability or about Schreiber otherwise violating the ADA. Nor is there any testimony about Hatch's behavior being motivated by Brundy's disability. At best, it can be inferred from Brundy's testimony that she raised

concerns about her disability being exacerbated by Hatch's behavior, but such concerns do not constitute opposition based on conduct by Schreiber made unlawful by the ADA.[9] Thus, the evidence shows that the concerns raised by Brundy in her May 2016 meeting Keeton were merely general employment grievances about the behavior of another employee, not protected opposition for purposes of a retaliation claim under the ADA.

Second, as discussed above, there is no evidence in the record that Brundy raised any concerns at all about her disability when she complained to Moto about Barret's behavior in July 2016. In her deposition, Brundy testified that, during her July 2016 meeting with Moto, she raised "concerns for [Barret's] incompetence and [her] concerns that [she] was being sexually harassed." (Brundy Dep. at 68:11-69:14.) Brundy did not testify that she told Moto about her disability during the July 2016 meeting. Nor is there any evidence that she raised any complaints about Schreiber failing to accommodate her or otherwise comply with the ADA during that meeting. Thus, Brundy's complaints to Moto in July 2016 did not rise above the level of a generalized employment grievance. There is no evidence that Brundy engaged in protected opposition under the ADA during the July 2016 meeting.

Third, Brundy's complaints to Gao in August 2016 were focused on Barret's alleged incompetence and sexual harassment as well. In her UALD intake form, Brundy stated:

> I still had problems with [Barret], and I went to Joyce Gao, our new TA, to file an official complaint. It took three pages for me to describe his *inappropriate sexual behavior and general incompetence*. We signed and dated the complaint.

---

[9]     As discussed above, the court has already concluded that Brundy has not shown that she made a reasonable request for accommodation relating to the conduct of Hatch.

(UALD Intake Form at 5, ECF No. 21-6 (emphasis added).) Brundy also testified in her deposition about a meeting held in August 2016 with Gao and other Schreiber employees. In that meeting, however, she testified that her focus was on convincing her supervisors that Barret was incompetent. (*See* Brundy Dep. at 73:14-78:20.) Brundy did testify that she also discussed her "severe social anxiety and PTSD" in that meeting, but she only indicates that she raised concerns about her disability in connection with her request not to be moved away from line 10. (*See id*. at 80:11-81:12.) There is no evidence that Brundy raised any concerns or made any complaints about Schreiber failing to comply with the ADA during August 2016, whether in the formal meeting she had with Gao and other Schreiber employees or otherwise. Brundy's own testimony shows that the complaints she raised about Barret at that time were based on claims of sexual harassment and incompetence. Thus, they could not have constituted protected opposition against Schreiber based on a perceived violation of the ADA. There is no evidence that Brundy communicated any belief that Schreiber was not complying with the ADA to Schreiber in August 2016.

Finally, Brundy points to a complaint she made to Roger Oschenbein in October 2016, shortly before she was fired. In her deposition, Brundy testified that she raised concerns to Oschenbein regarding another incident with Barret in October 2016 and told him about Gao's informal policy that Brundy and Barret were not allowed to speak to each other or be within approximately ten feet of each other. (Brundy Dep. at 97:14-99:11.) She also testified that she told Oschenbein that if Barret continued to harass her, she would "file a sexual harassment suit against the company." (*Id*. at 99:8-11.) There is no evidence, in Brundy's deposition testimony or otherwise, that Brundy ever raised any concerns with Oschenbein regarding her disability. Nor is

there any evidence that she complained to Oschenbein about Schreiber failing to accommodate her disability or about Schreiber otherwise failing to comply with the ADA.

Brundy's indication to Oschenbein that she was considering pursuing a sexual harassment suit based on Barret's behavior may have constituted protected activity under laws protecting against sexual harassment, but Brundy has not brought a sexual harassment claim in this case. She has brought a disability discrimination claim. Without showing that she raised communicated her concerns about Schreiber's compliance with the ADA, she cannot rely on her complaints about sexual harassment to show that she engaged in protected opposition for purposes of her ADA retaliation claim.

While Brundy has failed to meet her burden of showing that she engaged in protected activity under the ADA's opposition clause, the parties agree that she did engage in at least one protected activity under the ADA's participation clause—her request that she remain assigned to Line 10 as an accommodation for her disability.[10] Thus, to make out her prima facie case of retaliation, Brundy must show that Schreiber terminated her employment in retaliation for asking to remain assigned to Line 10.

The court concludes that Brundy has not submitted evidence that would be sufficient to allow a reasonable jury to find a causal connection between her request to remain assigned to Line 10 and her eventual termination. Brundy's request to remain assigned to Line 10 was made

---

[10]     Brundy claims in her opposition memorandum that she made another request for accommodation in relation to her complaints about Barret's behavior in July 2016. As the court has already decided above, however, Brundy has not shown that she communicated to Schreiber that any accommodation relating to the behavior of Barret in July 2016 was needed *because of her disability*. Thus, Brundy has not shown that she made a request for a reasonable accommodation under the ADA relating to Barret's conduct. Accordingly, Brundy's complaints about Barret do not constitute protected activity under the ADA's participation clause.

in May 2016, five months before she was terminated. Brundy has submitted no evidence that Schreiber had a problem with keeping Brundy assigned to Line 10. And, indeed, she remained assigned to Line 10 until shortly before her termination.

Moreover, at the time Brundy was terminated, she had voluntarily accepted a promotion that would require her reassignment to a new line—Line 11. Thus, even if there were evidence that Schreiber was concerned about accommodating Brundy's request to remain assigned to Line 10, any causal connection between such a concern and Brundy's termination would be undermined by the fact that Brundy was no longer assigned to Line 10 at the time of her termination.

Because Brundy has not come forward with sufficient evidence to show a causal connection between her request for accommodation and her ultimate termination, her retaliation claim fails as a matter of law. Accordingly, the court will grant summary judgment in Schreiber's favor on Brundy's retaliation claim.

<u>**Conclusion**</u>

For the reasons stated above, the court **GRANTS** summary judgment in Schreiber's favor on Brundy's first cause of action, for failure to accommodate, and third cause of action, for retaliation. The court **DENIES** summary judgment on Brundy's second cause of action for discriminatory termination.

DATED this 6th day of December, 2023.

BY THE COURT:

Clark Waddoups
United States District Judge

32